UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HENRY DESEAN ADAMS,

Plaintiff,

v.

DR. JESSICA HAMILTON, et al.,

Defendants.

Case No. 17-cv-00327-YGR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND ADDRESSING PENDING MOTIONS**

## I.  INTRODUCTION

This is a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 filed by Plaintiff Henry Desean Adams, a state prisoner who is currently incarcerated at the California Men's Colony ("CMC").  The operative complaint in this action is the second amended complaint ("SAC"), in which Plaintiff alleges deliberate indifference to his medical needs during his previous incarceration at Martinez Detention Facility ("MDF") from 2016 to 2017.  Dkt. 20 at 3-6.[1] Plaintiff was transferred from MDF to California Department of Corrections and Rehabilitation ("CDCR") custody on December 13, 2018 and then to CMC on April 25, 2019.  Dkt. 52 at 1, fn. 1.

The Court begins by outlining the procedural background of this matter.  On January 23, 2017, Plaintiff filed his original complaint.  Dkt. 1.  On August 1, 2017, the Court reviewed Plaintiff's original complaint pursuant to 28 U.S.C. § 1915A and dismissed the complaint with leave to amend with various instructions to correct certain deficiencies, including that Plaintiff must file an amended complaint that complies with the joinder requirements of Federal Rule of Civil Procedure 20(a).  Dkt. 13.  The Court provided Plaintiff with the rules regarding joinder of Defendants as well as other pleading requirements.  *See id*.  Thereafter, Plaintiff filed his amended complaint.  Dkt. 14.

On January 19, 2018, the Court reviewed Plaintiff's amended complaint and dismissed it with leave to amend with instructions to correct deficiencies, including that Plaintiff must

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

establish legal liability of each person for the claimed violation of his rights. Dkt. 16.

As mentioned, on January 31, 2018, Plaintiff filed his SAC, which is the operative complaint. Dkt. 17. In his SAC, Plaintiff named the following Defendants: MDF Medical Director Jessica Hamilton; MDF Nurse Provider Paul Manaut; and "MDF Pill Call Nursing Staff," including Licensed Vocational Nurses ("LVNs") Stephanie Monahan, Maritess[2] Rayrao, and Mary Bolds, as well as Nurses "Sahara, Samaria, Vince, and Jennifer."[3] *Id.* at 1. Plaintiff seeks monetary damages. *Id.* at 3.

In an Order dated July 5, 2018, the Court determined that the SAC raised a cognizable claim for deliberate indifference[4] to his serious medical needs against the above named Defendants. *See* Dkt. 20.

On September 7, 2018, Defendants filed an answer to the SAC. Dkt. 28.

The parties are now presently before the Court on Defendants' dispositive motion. Dkt. 34. Defendants move for summary judgment on Plaintiff's claim of deliberate indifference to his serious medical needs on the following grounds: (1) Defendants were not deliberately indifferent to Plaintiff's medical needs; (2) Defendants are entitled to qualified immunity; (3) issue preclusion bars this Court from reviewing Plaintiff's claim because a state court has already decided that Defendants were not deliberately indifferent; and (4) Plaintiff failed to exhaust administrative remedies. *Id.* Specifically, as to their first arguments on the merits of Plaintiff's claims, Defendants contend that "[t]here is insufficient evidence of a genuine issue of material fact" as to

---

[2] In his SAC, Plaintiff identified Defendant Rayrao as "Nurse Maritest," *see* Dkt. 17 at 2, but the correct spelling of her first name is "Maritess."

[3] Defendants "Sahara, Samaria, Vince, and Jennifer" have not been served in this action. In an Order dated November 19, 2018, the Court gave notice to Plaintiff regarding unserved Defendants "Sahara, Samaria, Vince, and Jennifer," and it requested that Plaintiff provide the last names of these unserved Defendants. Dkt. 45. To date, Plaintiff has not provided their last names as required by the November 19, 2018 Order. Plaintiff states that he is "unable to get this information." Dkt. 46 at 3. However, as explained below, the Court will resolve all claims against these unserved Defendant after it has resolved all claims against the served Defendants.

[4] The Court initially used the Eighth Amendment standard when it conducted its initial review. However, it has become clear that Plaintiff was a pretrial detainee at the time of the events set forth in his SAC. As such, the correct standard that applies in this case is instead the Fourteenth Amendment standard.

the following deliberate indifference claims: (a) for the administration of the "wrong medicine";
(b) for refusing to treat Plaintiff's H. Pylori and prostate infections; (c) for lying to Plaintiff
regarding his medical test results and delaying treatment; (d) for refusing to perform certain
medical testing; and (d) for administering medication to Plaintiff after being told by him that the
medication caused him illness.

Plaintiff filed an opposition to Defendants' motion. Dkt. 50.

Defendants have filed a filed a reply with objections to certain arguments, statements and
documents submitted by Plaintiff in support of his opposition, which the Court will construe as a
motion to strike. Dkt. 52 at 5-8. Specifically, Defendants assert they should be stricken because
some of Plaintiff's exhibits contain inadmissible hearsay testimony. First, the federal rules of
evidence provide that a witness may make any statement from his own personal knowledge. *See*
Fed. R. Evid. 602. If any of these supporting arguments, statements and documents were not
based on his personal knowledge or were not relevant to the issues, the Court has not considered
them. Second, the Court concludes that even if any of them were admitted and accepted at face
value, Defendants still would be entitled to judgment as a matter of law, as set forth below.
Although some of the documents in question are discussed in its analysis, the Court also points out
that such evidence is not sufficient to defeat summary judgment. Accordingly, Defendants'
motion to strike is DENIED as moot. Dkt. 52.

On November 6, 2018, Defendants also filed a Request for Judicial Notice in support
Defendant's Motion for Summary Judgment. Dkt. 36. Additionally, Defendants filed an
Administrative Motion to File Under Seal on November 6, 2018. *Id.* On July 2, 2019, the Court
granted Defendants Administrative Motion to File Under Seal.[5] Dkt. 53.

On April 29, 2019, Plaintiff filed a motion requesting hours at the law library and
assistance in obtaining a lab specialist, medical examiner, and a doctor, along with other materials
to prepare an effective case. Dkt. 51. On May 31, 2019, Defendants filed an opposition to

---

[5] The Court has reviewed the documents with redacted information submitted in this matter
and will not include such redacted information in the instant Order as it does not affect the Court's
ultimate decision.

3

Plaintiff's request. Dkt. 53.

Having read and considered the papers submitted in connection with this matter, the Court hereby GRANTS Defendants' motion for summary judgment as a matter of law on Plaintiff's Fourteenth Amendment claim. Dkt. 34. Because the Court will resolve a similar deliberate indifferent claim in favor of the served Defendants, it also GRANTS summary judgment as to the deliberate indifference claim against unserved Defendants "Sahara, Samaria, Vince, and Jennifer." The Court also addresses all other pending motions below. Dkts. 36, 51, 52.

## II. FACTUAL BACKGROUND[6]

### A. The Parties

At the time of the events set forth in his SAC, Plaintiff was a pretrial detainee who was incarcerated at MDF. *See* Dkt. 1.

Defendant Hamilton is a Board Certified Family Practitioner and the lead physician for Contra Costa County Detention Health Services. Declaration of Jessica Hamilton ("Hamilton Decl.") ¶¶ 2-3. Defendant Hamilton personally tended to Plaintiff at least six times and discussed Plaintiff's condition with the other coworkers who were also providing care to Plaintiff. Hamilton Decl. ¶ 4. Defendant Hamilton also reviewed Plaintiff's medical charts as part of the proposed treatment plan. *Id.*

Defendant Manaut is a nurse practitioner employed with Contra Costa County Health Services. Declaration of Paul Manaut ("Manaut Decl.") ¶ 3. He has personally met with Plaintiff

---

[6] This Order contains many acronyms. Here, in one place, they are:

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| CMC | California Men's Colony |
| CT | Computed Tomography |
| EDG | Esophagogastroduodenoscopy |
| LVN | Licensed Vocational Nurse |
| MDF | Martinez Detention Facility |
| PLRA | Prison Litigation Reform Act |
| RN | Registered Nurse |
| RJN | Request for Judicial Notice |
| SAC | Second Amended Complaint |
| UTI | Urinary Tract Infection |

approximately ten times, and reviewed Plaintiff's medical records and charts in the course of care that was provided to Plaintiff while incarcerated at MDF. *Id.* at ¶¶ 5-6.

Defendants Rayrao, Monahan, and Bolds are all LVNs (collectively "LVN Defendants") who provide medication to inmates at MDF among other duties. *See e.g.*, Declaration of Maritess Rayrao, LVN ("Rayrao Decl.") ¶ 4; Declaration of Mary Bolds, LVN, ("Bolds Decl.") ¶ 4.

### B. MDF Medical Procedures

Controlled medication is given to inmates either at a deputy desk within a given module at MDF, or at the cell door of patients who are not free to leave their cell. In both cases, an LVN administering the prescription watches the inmate-patient take the prescribed medication. Bolds Decl. ¶ 5. This process is informally called the "pill pass." *Id.* When an inmate refuses to take a prescribed medication, LVN charts the refusal and typically has the patient sign a document entitled "refusal of medical care." Any medication refused is noted in the detention facility's medical records. Bolds Decl. ¶ 7.

A part of their duties, the LVN Defendants work as "pill pass nurses," who administer medication to inmates. *Id.* ¶ 10. (However, Defendant Rayrao has not administered medication to Plaintiff since April 2016, and works mostly with clinicians at the present time. *See* Rayrao Decl. ¶ 4.) As LVNs, these Defendants cannot decide whether to administer medications or not. *Id.* Only a clinician can start, stop, or change a prescription administered by the LVN Defendants; they have no control over what is given to Plaintiff. *Id.* at ¶ 8; Rayrao Decl. ¶5; Hamilton Decl. ¶ 44.

At MDF, appointments are made through request slips provided to deputies or nurses, and inmates are seen on a priority basis, depending on the seriousness of the issue and other factors. Manaut Decl. ¶ 21. Appointments may be delayed or rescheduled due to many factors, including the patient being in court, the sick call clinics being overbooked, the sick call clinics closing for the day, or there being no escort deputy available, as patients must be escorted to all doctor appointments by a deputy. *Id.*

Outside appointments for inmate-patients, such as diagnostic testing beyond the capabilities of the detention center medical office, are scheduled through the Contra Costa

1    Regional Medical Center ("CCRMC"), which is responsible for determining who can conduct

2    outside testing or treatment.  *Id.* at ¶22.  When scheduling appointments with inmate-patients the

3    factors taken into consideration include available deputies, type of testing or treatment sought, and

4    the availability of CCRMC staff to perform the requested medical care.  *Id.*  CCRMC and MDF

5    medical staff do not delay or deny treatment to inmate-patients based on their incarceration status.

6    *Id.*  Defendants allege that all of Plaintiff's tests were taken in the normal course and scope of the

7    operation of the health facilities at MDF and CCRMC.  Hamilton Decl. ¶¶ 47-48.

8        **C.**     **Plaintiff's Version**

9        Plaintiff claims that in the month of June 2016, he was provided with the "wrong

10   medication" that caused adverse effects.  Dkt. 17 at 3.  Plaintiff further alleges that he

11   consequently contracted "H. pylori and a prostate infection," which the MDF medical staff refused

12   to treat.  *Id.*  Plaintiff also alleges that his blood and urine tests results were abnormal, but

13   Defendants Hamilton and Manaut stated that the tests were normal and "lied about [the] test

14   results on numerous of other occasions," delaying Plaintiff's proper medical attention.  *Id.* at 4-5.

15       Plaintiff also claims he was denied the following requests: (1) to be treated in a timely

16   manner for his H. pylori and prostate infections by Defendants Hamilton and Manaut; (2) to have

17   blood and urine work done for cancer, syphilis, type 2 diabetes, and prostate infection by

18   Defendant Hamilton; and (3) to have proper medication administered to him by the "pill call

19   nursing staff" at MDF, including "Nurses Stephanie, Marytes[s], Mary, Sahara, Samaria, Vince,

20   and Jennifer," after they were told by Plaintiff that the medication caused him illness.  *See id.* at 4-

21   6.

22       Plaintiff alleges that he was successfully treated for the H. pylori infection on May 11,

23   2017 and for the prostate infection in November 2017[7].  *Id.*  Additionally, as of January 26, 2018,

24   he alleges he still experiences inflammation in the prostate region, as well as similar symptoms

25   and pains.  *Id.*

26

27       [7] Plaintiff indicates that he was treated for the prostate infection in "November 20*18*." Dkt.

28   17 at 4 (emphasis added). However, Plaintiff seems to have made a typographical error, and the
     Court assumes he meant November 20*17*.

### D. Defendants' Version

Defendants allege that Plaintiff's course of care with MDF is replete with testing and treatment. Dkt. 34 at 13. As stated in the declarations of Defendants Hamilton and Manaut, Defendants claim that Plaintiff's treatment was above community standards. Hamilton Decl. ¶ 53; Manaut Decl. ¶ 7.

#### 1. The "Wrong Medication"

Plaintiff claims that he was given the "wrong medication" in June 2016, in the form of Zyrtec, which he asserts caused an H. Pylori infection and a prostate infection. Dkt. 20 at 2-3; Dkt. 17 at 3; Jason W. Mauck Declaration (Mauck Decl.), Ex. 1 (Pl.'s Dep.) 21:14-21 and 27:19-22. Zyrtec is used to treat rhinitis and allergies. Hamilton Decl. ¶¶ 6-7. Plaintiff was given Zyrtec between April 2016 and July 2016. *Id.* Allergies to Zyrtec are very rare and symptoms of adverse reactions do not include the symptoms that Plaintiff is claiming, including chest pains and abdominal pain. *Id.* at 8. Furthermore, Plaintiff admitted on April 6, 2016 that his chest pains started when he was having a bout of seasonal allergies, which was before the prescription for Zyrtec was issued. Hamilton Decl., Ex. 1 at CCC 122.

In addition to Plaintiff's complaints of chest pains, his reported headaches were also intermittent, and not consistent throughout the time that he was taking Zyrtec. *Id.* at ¶ 10. Defendant Hamilton notes that intermittent headache complaints demonstrate that Plaintiff's concerns over headaches, dizziness or drowsiness are unrelated to any specific medication since the medication was consistent, but the alleged symptoms were not. *Id.*

Plaintiff was administered a computed tomography ("CT") scan[8] in response to repeated headache claims. The results of the scan were benign with no abnormality located within the imaging. *Id.* at ¶ 14. Since the CT scan, Plaintiff has not complained of headaches with sufficient regularity—or with other associated symptoms—to suggest that there are any serious medical conditions. *Id.* at ¶ 15. Defendant Hamilton believes that the chest pains, headaches, and

---

[8] A CT scan allows a doctor to see inside a body using a combination of X-rays and a computer to create pictures of the body's organs, bones, and other tissues. *See* https://www.webmd.com/cancer/what-is-a-ct-scan#1 (visited on July 30, 2019).

dizziness that Plaintiff complains about are not related to Zyrtec. *Id.* at ¶ 11. Plaintiff was prescribed Claritin for his allergies in July 2016, however, when offered Claritin, he refused it and elected to continue to use Zyrtec. *Id.* at ¶ 7. Defendants opine that, it is very unlikely that Zyrtec caused the symptoms reported by Plaintiff. Hamilton Decl. ¶¶ 5a, 11.

### 2. Subsequent Treatment

A summary of the most germane medical treatment is included in the declaration of Defendant Hamilton, however, the most pertinent treatment is as follows:

> 1. [Plaintiff] was administered a fecal immunological test on October 17, 2016. The test results were negative, meaning that there was a low chance of colorectal cancer, polyps, ulcers or other issue in the intestines that might manifest with blood in the stool–such as an H. Pylori infection[9]. Other tests, such as blood work, were performed at the same time and also revealed results within normal limits. *Id.* at ¶ 18.
>
> 2. Over the next few months [Plaintiff] was seen by nursing staff and medical providers to explain test results, which were all within normal limits. *Id.*
>
> 3. It was not until January 13, 2017 that a fecal exam showed the presence of H. Pylori in [Plaintiff's] stool. On that day, [Plaintiff] started prescriptions for Prilosec, Biaxin, and Flagyl to treat the H. Pylori. *Id.* at ¶ 19.
>
> 4. [Plaintiff] only took the medications together once, the evening of January 18th. He did not take them together afterwards. *Id.* at ¶ 20. The prescription changed on February 15, 2017, and was provided to [Plaintiff] for him to keep and take himself. His abdominal symptoms improved with the treatment and he never needed a refill. *Id.* at ¶¶ 22.
>
> 5. On June 23, 2017, an Esophagogastroduodenoscopy ("EGD")[10]

---

[9] As mentioned above, H. Pylori is a common type of bacteria that lives in the digestive tract. According to Defendant Hamilton, it can take years to manifest symptoms, which can include stomach and intestinal ulcers. Hamilton Decl. ¶ 18. Over two-thirds of the world's population has a form of H. Pylori in their bodies, and a large percentage of that group never manifest symptoms. *Id.* It is the most common chronic bacterial infection, and often goes untreated. *Id.* In diagnosing H. Pylori, if no signs or symptoms of an ulcer exist, there is generally no reason to do further testing since ulcers are the symptom of an active H. Pylori infection. *Id.* ¶¶ 17-19. To test for ulcers, a Fecal Immunological Test is administered, which generally tests for blood in stool. *Id.* ¶¶ 16, 18.

[10] An EGD is a procedure that involves inserting an endoscope, or flexible tube with a small camera on the end, through the mouth and down the esophagus to the stomach and duodenum. A doctor can use this to look for the source of bleeding and/or collect small tissue samples for examination under a microscope (a procedure known as a biopsy). *See* https://www.webmd.com/digestive-disorders/qa/how-is-an-esophagogastroduodenoscopy-egd-

was performed which showed some gastritis, or inflammation of the stomach of unknown origin, but no H. Pylori present. *Id.* at ¶ 23.

6. On August 30, 2017, [Plaintiff] first complained to a medical provider of burning urination. *Id.* at ¶ 25.

7. On September 5, 2017, [Plaintiff] was examined in response to concerns over "testicular cancer," and that he was not being treated for STDs. He also complained of painful urination (dysuria) intermittently in the preceding seven days. A urinalysis was ordered along with a prescription for Bactrim DS, an antibiotic. *Id.* at ¶ 26. The test results were compromised, requiring a second test.

8. A further urine sample was taken on September 20, 2017, which showed results within normal limits. This urinalysis also checked for the presence of bacteria in [Plaintiff's] urine and revealed nothing of note. *Id.* at ¶ 27.

9. A further urinalysis was completed on October 4th which revealed bacteria in plaintiff's urine. A prescription for Keflex, an antibiotic, was started which was later changed due to the bacteria being resistant. *Id.* at ¶28.

10. A further urinalysis on October 31, 2017, showed no bacteria in [Plaintiff's] urine. *Id.* at ¶ 29.

11. On November 13, 2017, [Plaintiff] was examined for lower abdominal pain despite normal test results, a normal testicular ultrasound, and the fact that his symptoms did not change with the urinary tract infection ("UTI") nor resolve once the UTI was treated. Despite normal test results he was issued an order for an appointment with a urologist to examine him for prostatitis. *Id.* at ¶ 30.

12. A urinalysis on November 14th showed the return of bacteria in [Plaintiff's] urine. He was prescribed a six-week course of Cirpofloxacin in response. *Id.* at ¶ 31.

13. The Ciprofloxacin allegedly caused [Plaintiffs] acid reflux, and he refused the medication a number of times. In response, his prescription was changed to Bactrim. He took Bactrim twice before requesting a change back to Ciprofloxacin, denying any previous issues with the drug. *Id.*

14. A further urinalysis on November 22, 2017, revealed that [Plaintiff's] urine was once again free of bacteria. *Id.* at ¶ 32.

15. The plaintiff was seen by a urologist, Dr. Kleinerman, on December 15, 2017, who recommended no treatment beyond more fluids. A follow-up cystoscopy was performed on January 22, 2018, which revealed no abnormalities except some mild swelling of the urethra that did not warrant medical intervention. *Id.* at ¶ 33.

16. Over the ensuing six months, [Plaintiff] refused at least four

routine medical appointments even after being informed of their pendency in his grievance responses. *Id.* at ¶ 34.

Interspersed with the above were several tests for sexually transmitted diseases, including syphilis, gonorrhea, human immunodeficiency virus and Chlamydia. *Id.* Plaintiff has also been tested for diabetes at MDF at least three times, and each of those tests showed that Plaintiff was not diabetic. *Id.* at ¶ 37.

Similarly, Plaintiff's blood and urine test results were relatively normal (outside of some minor issues) and did not indicate the existence of any chronic medical condition. *Id.* at ¶¶ 40-41. For example, Defendants explain, there were some isolated test results that were flagged by the testing company, but such results do not necessarily indicate that there is a serious medical issue in need of emergency treatment. *Id.* A test result can be considered healthy even if some of specific measurements are slightly outside the testing lab's parameters. *Id.* Defendants state that, in Plaintiff's case, the few measurements outside the testing lab's parameters were not consistent across all of his urinalysis results, suggesting that some measurements resulted from diet and other factors rather than a chronic condition in need of intervention. *Id.*

Plaintiff has frequently requested a blood test for cancer test while incarcerated and claims that one should have been administered. Dkt. 20 at 3. However, according to Defendant Hamilton, there are tests that can be done to check for specific forms of cancer, but those tests are performed after there are already symptoms of cancer. Hamilton Decl. ¶ 38. Plaintiff has "never presented with symptoms requiring a specific cancer test." *Id.* Despite the lack of evidence dictating a specific test, Defendants performed many tests that would detect certain types of cancer, including a testicular ultrasound, an EGD, a cytology analysis of Plaintiff's urine, and a cystoscopy. *Id.* at ¶ 39. No test results raised any cancer concerns. *Id.*

Defendants claim that Plaintiff was provided more than adequate care while incarcerated at MDF. Hamilton Decl. ¶ 53, Manaut Decl. ¶ 7. In fact, Plaintiff even admitted that he sees the medical staff "all the time" at MDF. Pl.'s Dep. 49:10-13, 64:21-65:2, 77:22-78:7. All of the conditions that Plaintiff raised concerns about have resolved—except the dysuria, which has an unknown cause despite a battery of testing and ample ongoing treatment. Hamilton Decl. ¶¶ 35, 53. The MDF staff repeatedly spoke with Plaintiff about his test results and he indicated that he

understood what was explained to him, but then filed grievances over the issues that were discussed. *Id.* at ¶ 52.

### 3. Administrative Appeals Relating To Relevant Claims

The Contra Costa County Sheriff's Office (the "Sheriff's Office") maintains a policy which set forth the requirements for inmates to properly submit and appeal grievances, including grievances regarding "medical care." Dkt. 42-3; Dkt. 42-4; Dkt. 42-5. The polices contain the grievance procedure and describes the appeal process that inmates must exhaust. *Id.* The "Inmate Grievance Procedures" first requires that an "Informal Grievance" be submitted prior to submitting a formal written grievance. Dkt. 42-3 at 8. If the informal grievance is not resolved to the inmate's satisfaction, then he is required to submit a "Formal Grievance." *Id.* at 8-10. The formal grievance must be in writing; submitted within 48 hours of the incident; submitted on the facility-issued form; and given to a deputy. *Id.* In the case of medical requests and grievances, they are forwarded to the proper medical staff employee such as a nurse or doctor. Manaut Decl. ¶ 23. Upon review of the grievance, the relevant staff member will send a response and disposition in writing to the inmate. Dkt. 42-3 at 9-10. The inmate has a right to appeal any decision on a grievance. *Id.*

The "Inmate Appeals Process" requires that an appeal be submitted in writing on the facility-issued form within three (3) days of the grievance disposition. Dkt. 42-4 at 2. The same "Inmate Request Form" is used for requests, grievances, and appeals. Pl.'s Dep. 62: 9-14. The Inmate Appeals Process requires that inmates "appeal previous decisions until they have been satisfied or the detention division chain of command has been exhausted." Dkt. 42-4 at B at II. On June 19, 2015, Petitioner signed an "Inmate Orientation" verification form whereby he declared, "I viewed the inmate orientation video and have no questions regarding Contra Costa County Custody Services Bureau policies and procedures." Dkt. 42-6 at 2. This includes information on the appeals process.

Each inmate who is brought into custody is assigned a booking number and a file is created which contains incident reports, formal disciplinary actions, inmate requests, grievances and appeals. In the case of medical requests or grievances that are routed to a medical staff employee

such as a nurse or doctor, copies are maintained in the inmate's medical records. Manaut Decl. ¶ 23. None of Plaintiff's records demonstrate proper exhaustion of any medical grievances, and no record exists showing any exhausted appeals relating to Plaintiff's use of Zyrtec—or any of the above concerns regarding alleged lapse in medical care. Each of Plaintiff's medical concerns and grievances were responded to in a timely manner, and Plaintiff was never denied necessary medical treatment. Manaut Decl. ¶ 25. All appeals, including those relating to medical grievances, are required to follow the CSB procedures.

Plaintiff submitted many grievances over the time he received medical care, but Defendants claim he never exhausted the appeals process. Dkt. 47 at 5. The medical staff at MDF addressed the grievances by responding to Plaintiff, assisting him in getting further medical care, or explaining the current status of his medical treatment and when his next appointment was scheduled. Manaut Decl. ¶ 25. In fact, Defendant Hamilton personally spoke with the facility commander at MDF regarding Plaintiff, and she also met with Plaintiff and the facilities commander together, at least twice, to go over various grievances and to discuss Plaintiff's medical conditions. Hamilton Decl. ¶ 50. Plaintiff's own filings show responses by the MDF staff on the bottom of the many grievance slips submitted to this Court by Plaintiff. *See e.g.* Dkt. 14 at 10-54; Dkt. 29 at 217; Dkt. 30 at 2-33.

### 4. Plaintiff's State Court Decisions Relating to His Medical Claims

While awaiting trial on the charges against him, Plaintiff "mailed numerous letters to [the state] court requesting that he be seen by a urologist, and asserting that he had "walking pneumonia," and generally claiming that, "he has received improper medical care, medical malpractice, cruel and unusual punishment." Dkt. 36; RJN, Ex. A. In response to the allegations, the state court issued an order on March 13, 2018 denying the ex parte motion for medical care brought by Plaintiff. Dkt. 31 at 5-6. After reviewing the letters and grievances presented by Plaintiff with corresponding responses from medical staff and a letter from Defendant Hamilton explaining Plaintiff's test results, the state court looked at the complaints through the prism of 42 U.S.C. § 1983 and the deliberate indifference standard articulated in *Estelle v. Gamble*, 429 U.S. 97 (1976). The court found that medical staff had responded to Plaintiff's complaints and that the

"claims of inadequate medical care are unfounded as the medical and jail staff have conducted various medical tests on [Plaintiff], per his request, and the results have been negative." Dkt. 36; RJN, Ex. A.  The motion was denied, and Plaintiff did not appeal or contest the state court's ruling.

### III.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Id*.  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). Submitted by Defendants in support of the motion for summary judgment are Plaintiff's deposition (Mauck Decl., Ex. 1) and all declarations and supporting exhibits, including medical records, from the following: Defendants Hamilton (Dkt. 38), Manaut (Dkt. 39), Rayrao (Dkt. 40), and Bolds (Dkt. 43); and Defendants' attorney, Deputy County Counsel Jason W. Mauck (Dkt. 42). Meanwhile, Plaintiff has filed his verified SAC (Dkt. 17), his verified opposition and verified declaration in support of his opposition, as well as various exhibits, including medical records and inmate request forms relating to his medical records, all filed in support of his opposition (Dkt. 50). The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).

Claim preclusion may be raised in a motion for summary judgment. *Cf. Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007) (finding that claim preclusion may be presented in a Rule 12(b)(6) motion to dismiss). In the preclusion context, a federal court may take judicial notice of the record in the earlier proceeding. *Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1037 (9th Cir. 2005); *see also Biggs v. Terhune*, 334 F.3d 910, 915 n.3 (9th Cir. 2003) ("Judicial notice is properly taken of public records, such as transcripts, orders, and decisions made by other courts or administrative agencies."), *overruled in part on other grounds*, *Hayward v. Marshall*, 603 F.3d 546, 555 (9th Cir. 2010) ("[m]aterials from a proceeding in

another tribunal are appropriate for judicial notice"). Here, as explained above, the Court takes judicial notice of the state court records relating to Plaintiff's prior state proceedings. Therefore, the Court GRANTS Defendants' Request for Judicial Notice in support Defendant's Motion for Summary Judgment. Dkt. 36.

## IV. DISCUSSION

### A. Deliberate Indifference to Medical Needs Claim

Deliberate indifference to an incarcerated person's medical needs violates his or her federal constitutional rights. The source of this right differs depending on whether the incarcerated person is a pretrial detainee or a convicted prisoner at the time of the alleged violation. The source of the right for a convicted prisoner is the Eighth Amendment's Cruel and Unusual Punishments Clause. However, where the incarcerated person is a pretrial detainee, his or her rights derive from the Fourteenth Amendment's Due Process Clause. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). "'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 n.40 (1977)).

Under both the Due Process Clause and the Eighth Amendment, a key issue is whether the state actor acted with "deliberate indifference" to a medical need. In the past, the standard under both constitutional provisions was a subjective deliberate-indifference standard. *See Gordon v. County of Orange*, 888 F.3d 1118, 1122-23 (9th Cir. 2018). However, this subjective deliberate-indifference standard has changed in the Ninth Circuit and several other circuits. *Id.*, *see also Estate of Vallina v. County of Teller Sheriff's Office*, 2018 WL 6331595, at *2 (10th Cir. Dec. 4, 2018) (collecting cases). Now, the deliberate-indifference standard applying to a pretrial detainee's claim is an *objective* one rather than the subjective one that continues to apply to a convicted prisoner's claim.

[T]he elements of a pretrial detainee's medical care claim against an

individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. With regard to the third element, the defendant's conduct must be objectively unreasonable: "a test that will necessarily turn[] on the facts and circumstances of each particular case." *Id.* (citations and internal quotation marks omitted). "[T]he plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). Under this test, "[t]here is no separate inquiry into an officer's subjective state of mind." *Horton v. City of Santa Maria*, No. 15-56339, slip op. at 17 (9th Cir. Feb. 1, 2019).

Defendants argue they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim on the ground that no material facts are in dispute. Defendants add that, assuming their actions are found to be unconstitutional, it would not have been clear to a reasonable official that such conduct was unlawful and that therefore they are entitled to qualified immunity. As set forth below, the Court finds that Defendants are entitled to summary judgment on the merits of Plaintiff's Fourteenth Amendment claim.

### 1. Administering "Wrong" Medication

First, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they provided him with the "wrong medication," which caused him adverse effects including contracting "H. pylori and a prostate infection." Dkt. 17 at 3. The "wrong medication" at issue was Zyrtec, a common over-the-counter medication for the treatment of allergies. Hamilton Decl. ¶¶ 6-7.

Defendants argue that no evidence exists to show that Defendants acted with "deliberate indifference" to Plaintiff's medical needs. Dkt. 34 at 10. Defendants claim Zyrtec's common side effects do not include the list of medical issues cited by Plaintiff. Hamilton Decl. ¶ 11. Moreover,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

when Plaintiff complained about Zyrtec, Defendants provided an alternative option to him to switch to a different allergy medication. *Id.* at ¶ 7. Yet, Plaintiff requested to continue to use Zyrtec. *Id.*

As mentioned above, a prison official is deliberately indifferent if he or she made an intentional decision with respect to the conditions under which the plaintiff was confined and those conditions put the plaintiff at substantial risk of suffering serious harm. *Gordon*, 888 F.3d at 1125. Here, Defendants did intend to prescribe Zyrtec. However, no evidence exists to show that such an act was objectively unreasonable under the circumstances. As Defendants point out, Plaintiff complained of symptoms, such as chest pains, even before he began taking Zyrtec. Hamilton Decl., Ex. 1 at CCC 122. Plaintiff also complained of intermittent headaches during the time he was taking Zyrtec, indicating that his issues are unrelated to Zyrtec because the alleged symptoms were inconsistent during the time he took Zyrtec. *Id.* at ¶ 10.

Furthermore, Defendants argue that, "by requesting Zyrtec in light of an alternative–especially when [Plaintiff] was allegedly suffering symptoms from the Zyrtec–effectively concedes that Zyrtec was not the 'wrong medication.'" Dkt. 34 at 21. Defendants contend that Plaintiff had the opportunity to choose a different medication but he chose to continue Zyrtec, thus confirming Zyrtec was not the "wrong medication." *Id.* These facts further demonstrate the lack of any evidence showing objectively any substantial risk of serious harm. As such, a reasonable jury could find that Defendants took objectively reasonable available measures to abate the risks by providing Plaintiff with an alternative option.

Therefore, the Court finds that no reasonable jury could conclude that Defendants were deliberately indifferent when they administered Zyrtec to Plaintiff and provided him a reasonable alternative to taking Zyrtec.

### 2. Inadequate Treatment By Defendants Hamilton and Manaut

Plaintiff claims that Defendants Hamilton and Manaut were deliberately indifferent to his medical needs when they refused to treat his H. Pylori and prostate infections and "delayed in providing . . . proper medical attention." Dkt. 17 at 3, 5.

However, Defendants argue that Defendants Hamilton and Manaut were not deliberately

indifferent to Plaintiff's medical needs because they diagnosed and treated his H. Pylori infection in a timely manner. Dkt. 34 at 21-22. Moreover, Defendants assert that Plaintiff underwent significant testing and treatment throughout his incarceration at MDF and treatment was never delayed. *Id.*

Deliberate indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable section 1983 claim); *Hunt v. Dental Dept.*, 865 F.2d 198 (9th Cir. 1989) (delay of three months in providing dentures to inmate suffering serious dental problems, which appeared to have been more than an isolated occurrence of neglect, was deliberate); *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to summary judgment where plaintiff presented no evidence that delays between plaintiff's initial visit, diagnosis and visit to the specialist were within the doctor's control or the doctor was deliberately indifferent to the medical needs or that the delay contributed to plaintiff's injuries.) However, mere delay in medical care without more is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

Here, a reasonable jury could find that Defendants provided adequate care to Plaintiff, and that they did so in a timely manner. The record shows that when Plaintiff complained of side effects from taking Zyrtec, Defendants took every reasonable step in order to learn about Plaintiff's issues and to treat him through examining him as well as administering a variety of tests and medications over a substantial amount of time. Not only did Defendants go above and beyond in their treatment of Plaintiff's issues, they did so very quickly, without delay.

Plaintiff claimed of headaches and blurry vision in mid-August. Hamilton Decl. ¶ 13. In response to these claims, Plaintiff was administered a vision test, and a CT scan on September 23, 2016, which showed no abnormalities. *Id.* at ¶ 14. In response to a complaint of ongoing abdominal pain and blood in is stool, Plaintiff was given a Fecal Immunological Test in

September 2016, which came back as negative.  Hamilton Decl. ¶ 16.  Further blood tests and urine tests were performed between October and January, which also did not indicate any active infection.  *Id.* at ¶¶ 24-25.

When Plaintiff was ultimately diagnosed with an H. Pylori infection in January 2017, he was *immediately* prescribed medicine by Defendant Manaut—medication Plaintiff initially refused to take.  *Id.* at ¶ 20.  Despite the prescription, Plaintiff was eventually referred out to a specialist who determined that no evidence of an H. Pylori infection existed after treatment was provided by MDF staff.  *Id.* at ¶ 22.

The record also shows that Defendants made every effort to diagnose and treat Plaintiff's prostate infection and urinary tract infection ("UTI").  Plaintiff's complaints regarding his urinary tract began in mid-July 2017.  *Id.* at ¶ 24; CCC 116.  In response to the ongoing complaints, on August 30, 2017, Plaintiff was evaluated and ordered necessary tests, including a urine sample, which were normal.  *Id.* at ¶ 25.  He was also ordered a testicular ultrasound in September 2017, which also came back with normal results.  In addition, Plaintiff's urine was sent to the CCRMC's department of pathology for a cytology examination on September 20, 2017.  *Id.* at ¶ 27.  The test results were again negative and showed no signs of cancer.  *Id.*

Plaintiff was diagnosed with a UTI on October 4, 2017, only after a September 20th test came back without indication of infection.  *Id.* at ¶ 27.  In response to the UTI diagnosis, Plaintiff was given antibiotics the *same day* the test results came back positive.  *Id.* at ¶ 28.  The UTI subsided in October, but returned in November.  *Id.* at ¶ 31.  Again, he was provided medication the *same day* the test results were returned from the lab.  *Id.*  The medication allegedly caused stomach pain, and he was switched to a second medication, only to complain two days later that the second medication did not work and requested a return to the initial medication–denying any issues with it.  *Id.*  Despite a clean urology test at the end of November, Plaintiff was referred out to a urologist who performed an examination and a cystoscopy, the results of which were that the infection was minimal and did not warrant a prescription for antibiotics.  *Id.* at ¶¶ 32-33.  This evidence shows that Defendants treated Plaintiff's medical needs, including but not limited to his H. Pylori and prostate infections.

Even assuming that Plaintiff has presented credible evidence regarding his alleged inadequate treatment, he has only raised a difference in opinion over the interpretation of his test results and the course of care. Neither a difference in medical opinion on the course of treatment (*Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004)), nor isolated occurrences of neglect (*Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986))—which is not the case here—amount to constitutional violations. Conflicts in medical opinion are not a basis for a deliberate indifference claim related to medical care, and based on the evidence in support of the moving papers, no genuine dispute of material fact exists here. *See id.* Thus, Plaintiff has failed to provide evidence for a reasonable jury to find that Defendants Hamilton and Manaut were deliberately indifferent to his medical needs in treating his H. Pylori and prostate infections.

### 3. Lying About Plaintiff's Test Results and Delaying Treatment

Plaintiff further alleges that his blood and urine test results were abnormal, and Defendants Hamilton and Manaut "lied about [the] test results on numerous . . . occasions," delaying Plaintiff's proper medical treatment. Dkt. 17 at 4-5.

Defendants maintain that Plaintiff has undergone numerous blood and urine tests while incarcerated at MD and no indications exist that Plaintiff was ever misled as to any test results. Dkt. 34 at 22. Defendant Hamilton explained that test results can vary due to many factors, and one component of a test does not necessarily mean that there is any problem that needs to be treated. Hamilton Decl. ¶¶ 40-41. Both Defendants Hamilton and Manaut, among other practitioners, attempted repeatedly to explain the test results to Plaintiff. Hamilton Decl. ¶¶ 47, 50, 52; Manaut Decl. ¶¶ 6, 19.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that these Defendants were negligent in lying about his tests results and delaying treatment, his allegations do not support a deliberate indifference claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; M). As such, Plaintiff has not set forth sufficient evidence for a reasonable jury to find that Defendants Hamilton's and Manaut's actions were deliberately indifferent to his medical needs.

### 4. Refusal to Perform Medical Testing

Plaintiff claims he was denied requests to have blood and urine work done for cancer, syphilis, type 2 diabetes, and a prostate infection by Defendant Hamilton.

Defendants argue that "there can be no claim for denied testing in this matter[] [because] the medical records demonstrate that the requested testing was done." Dkt. 34 at 23. Defendants elaborate by stating as follows:

> First, the record shows that Plaintiff was tested for diabetes, syphilis, gonorrhea and AIDS three times each–even after he denied being sexually active. Hamilton Dec. ¶ 36. Plaintiff was also repeatedly tested for diabetes. *Id.* at ¶ 37. Plaintiff was also repeatedly given tests that would screen for certain types of cancer despite a lack of symptoms that would indicate the need for such tests. *Id.* at ¶¶ 38-39. All of the tests results were benign outside of the issues with H. Pylori and bacteria in Plaintiff's urine as described above.
>
> Contrary to Plaintiff's assertions, the medical records and other evidence show that Plaintiff was regularly seen by medical staff and Defendants while at the MDF, and was routinely prescribed and administered medication. Dr. Hamilton and Nurse Manaut, among many others, examined and treated Plaintiff on multiple occasions, and spoke with him repeatedly about his test results and his medical condition. There is simply no evidence that any medical care provider refused to see Plaintiff while he was incarcerated. In fact, to the contrary, the plaintiff refused to be seen for months despite ongoing subjective complaints and submitted grievances that he was in pain. *Id.* at ¶ 34. The fact that the plaintiff did not understand the medical test results, or that he was denied unnecessary repetitive testing (e.g. his STD tests), hardly amounts to a claim of deliberate indifference.

*Id.*

Even if Plaintiff preferred additional testing or different types of testing, preference on the course of medical care is, at most, only a difference of medical opinion and insufficient as a matter of law to show deliberate indifference. *Toguchi* 391 F.3d at 1058. As stated above, a difference in opinion is not sufficient to prove deliberate indifference. Therefore, the Court finds that no reasonable jury could conclude that Defendants were deliberately indifferent because the records shows that they did not deny Plaintiff medical tests for cancer, syphilis, type 2 diabetes, and a prostate infection.

### 5. Claims Against LVN Defendants

Plaintiff claims he was denied proper medication administered to him by the LVN Defendants after they were told by Plaintiff that the medication caused him illness.

Defendants contend that the LVN Defendants did not control the type of medication Plaintiff was authorized to receive, nor can any of them discontinue any medication. Bolds Decl., ¶ 8; Rayrao Decl., ¶ 5. Therefore, they argue that the LVN Defendants cannot be deliberately indifferent to Plaintiff's well being because they were in no position to do anything which might address his serious medical condition.

No reasonable jury could find that any of the LVN Defendants was deliberately indifferent. As noted above, the LVN Defendants did not have the authority to discontinue or change Plaintiff's medication. Bolds Decl., ¶ 8; Rayrao Decl., ¶ 5. A defendant's "[l]iability under [42 U.S.C § 1983] arises only upon a showing of personal participation by the defendant." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979)). Even if the LVN Defendants had been involved in administering to Plaintiff a medication in which they actually prescribed to him, such an act would at most amount to negligence, which is insufficient to state a claim for deliberate indifference. *See Franklin,* 662 F.2d at 1344; *Toguchi*, 391 F.3d at 1060; *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not a constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Therefore, Plaintiff's Fourteenth Amendment claim against the LVN Defendants fails as a matter of law.

### 6. Summary

In sum, none of the aforementioned actions by any of the Defendants, including Defendants Hamilton and Manaut; and the LVN Defendants would lead a reasonable jury to find deliberate indifference to Plaintiff's medical needs. In opposition, Plaintiff has failed to identify with reasonable particularity the evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, these aforementioned Defendants are entitled to summary judgment on the deliberate indifference claim against them, and their motion is GRANTED on this ground.[11]

---

[11] The Court's finding that the aforementioned Defendants are entitled to summary judgment as a matter of law on Plaintiff's Fourteenth Amendment claim obviates the need to address these Defendants' alternative arguments regarding any claim preclusion issues, an entitlement to qualified immunity, or Plaintiff's failure to exhaust his administrative remedies.

**B.** **Fourteenth Amendment Claim Against Unserved Defendants "Sahara, Samaria, Vince, and Jennifer"**

Summary judgment may be properly entered in favor of unserved defendants where (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have been briefed, and (3) Plaintiff has been provided an opportunity to address the controlling issues. *Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 802-03 (9th Cir. 1995).

As mentioned above, Defendants "Sahara, Samaria, Vince, and Jennifer" have not been served in this action and have not joined the other served Defendants in their motion for summary judgment.

It is apparent, however, that even though Defendants "Sahara, Samaria, Vince, and Jennifer" have not been served, summary judgment may be properly entered in their favor. *See id.* Specifically, the allegations against Defendants "Sahara, Samaria, Vince, and Jennifer" are the same as those against the other served Defendants in this action who were part of the "MDF Pill Call Nursing Staff," including Defendants Rayrao, Monahan, and Bolds. As explained above, the Court has granted summary judgment in favor of the served Defendants. There is no suggestion in the SAC or in the briefs filed in connection with the present motion for summary judgment, that the analysis differs with respect to unserved Defendants "Sahara, Samaria, Vince, and Jennifer" as opposed to the aforementioned served Defendants. *Cf. Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming grant of summary judgment in favor of nonappearing defendant where plaintiff, in response to summary judgment motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant).

Accordingly, the Court GRANTS summary judgment as to the Fourteenth Amendment claim against unserved Defendants "Sahara, Samaria, Vince, and Jennifer."

**V.    CONCLUSION**

For the reasons outlined above, the Court rules as follows:

1.    Defendants' objections to certain arguments, statements and documents submitted by Plaintiff in support of his opposition, which has been construed as a motion to strike, is DENIED as moot. Dkt. 52.

2.       Defendants' request for judicial notice in support of their motion for summary judgment is GRANTED.  Dkt. 36.

3.       Defendants' motion for summary judgment is GRANTED as to the Fourteenth Amendment claim against the served Defendants.  Dkt. 34.  The Court also GRANTS summary judgment as to the Fourteenth Amendment claim against unserved Defendants "Sahara, Samaria, Vince, and Jennifer."  Judgment will be entered in their favor.

4.       The Clerk shall terminate as moot all remaining pending motions, including Plaintiff's motion entitled, "Request For Court Order for Pro-Per Hours at Law Library [and] Assistance in Obtaining Lab Specialist, Medical Examiner and Doctor Along With Other Material[s] to Prepare Effective Case" (Dkt. 51), and close the file.

5.       This Order terminates Docket Nos. 34, 36, 51, and 52.

IT IS SO ORDERED.

Dated: September 5, 2019

_____
YVONNE GONZALEZ ROGERS
United States District Judge